Thank you. Good morning, Your Honors. I'm Richard Willstatter. I'm here for David Carmona. I did not represent Mr. Carmona in the District Court, but I am representing him now. Your Honors, the District Court manifestly erred in finding that the government had carried its burden of proof as to the guidelines loss. In light of that error, the District Court's decision to impose a 22-level increase in offense levels was clearly erroneous and should be reversed. At the sentencing, the government admitted its calculations were not on firm footing. The prosecutor said he would have to get into the weeds and confirm that stuff. So can you tell me what you think is the most unreasonable inference that was drawn? Well, the balance that they got from the Hernandez or all-the-user spreadsheet was the same term that the government admitted was fictitious earnings. The government admitted that in the ICOM website, the term balance was fictitious earnings. And then the District Court said that somehow that Juan Arellano's testimony was proved that there was $58 million in loss. He couldn't have said something like that. His testimony was essentially incomprehensible, did not support a finding that the District Court made that the government So the part that I, and this is supposed to, I'm trying to help get us to an answer here. The line between you disagreeing with the District Court over how to interpret the evidence and you being able to point to a specific unreasonable inference is a bit fine, but I'm hoping rather than the entirety of the testimony was fictitious, you can actually say what was the inference that you think was improper. Okay. So there were three issues. One, the Court found that Arellano testified that the Hernandez spreadsheets likely undercounted the number of users and balances and cited to a page of the trial record where he didn't say anything of the kind. That was clearly erroneous. Second, the District Court found that Ochoa pleaded guilty before information came out, and that was also false. When Ochoa was sentencing, the government said he was actually responsible for more than $21 million of loss based on the text message that the government is relying on between Mr. Carmona and Mr. Rodriguez. That's at page one, docket 119 in the District Court at pages 15 to 16. They said there was a $21 million loss, but as part of a plea agreement, they agreed to allow him to plead guilty to a guideline range of between $500 and $1.5 million based on what they said was his gain from the offense. So the District Court had that information. It wasn't new. And the parties had that spreadsheet, as Mr. Perez said, or for Mr. Carmona at the District Court sentencing. The parties had the spreadsheet, which, by the way, didn't have a total. You would have to total it. But, you know, the spreadsheet, there it was, okay, and the parties had it. They didn't present it to the District Court, but the District Court was aware that the government was claiming, and we don't think that there was a basis for it, of $21 million. And finally, the District Court found that the defendant did not accept responsibility, although he did accept responsibility. The government moved for the third point. He apologized to the court. It's somewhat inarticulate. But he admitted his guilt. He pleaded guilty substantially before the trial. And so there were three clearly erroneous findings. The ultimate finding … Do you have a position on what the loss amount actually is? Pardon me? Do you have a position on what the loss amount actually is? Yes. Between $500 and $1.5 million. Now, the government was — and I based that on the actual loss that the government was able to prove as found by the District Court of $789,000. That was the restitution amount that they found. That's what they could prove as actual loss. And the court found that the $58 million was actual loss, but the government could only prove $789,000 in actual loss. And let me just point out also that the court said this was a — the guideline finding was a very significant part of the sentencing. That's at page — Appendix 168 to 169. And that the guidelines were important. That's at page 183 of the appendix. And I say this because this was not harmless error. You cannot be certain that the judge would impose the same sentence. And the Seabrook case says the court cannot insulate its finding, its erroneous finding, by saying, I would impose the same sentence anyway. That's what the Seabrook case says. It's confirmed by the James case, and it's under Rule 52a. The government has the burden of proof on this, and they cannot carry it. I see that my time has expired, unless the Court has other questions for me. Thank you. Good morning, Your Honor. My name is Peter Tomeo. I represent David Brand on appeal. I did not represent him at trial. I did not represent him at sentencing or in his motion for a new trial. Your Honor, the — I'd like to focus on the district court's error in precluding him from providing any evidence regarding successful participation in uncharged, multiple-level marketing businesses. The court, on a motion from the government, did not continue to present any evidence regarding this. He was — there were a number of similar transactions he had been involved with over his career. However, the court permitted the government to introduce evidence regarding some of them, but categorically denied his request to introduce evidence as to the reasons. This was done prior to the trial, and it was done on the motion from the government. But can you tell me how to square the position that you were taking with Rules of Evidence 4.4b about propensity to act a certain way? Like, why would — what would the prior good acts have shown, if not — Well, it would have — it would have counted the government's evidence, which it did   But the court did not introduce a trial, which they say in their brief. They say that they were introduced five other transactions, because that showed a lack of mistake. That showed that he must know what's fraudulent and what's not fraudulent. The — why wouldn't then the arguments that there were other deals where he — similar deals which were not fraudulent, why shouldn't that come in? How does it become propensity to show — What is the line of reasoning that says it's not propensity evidence? I mean, you're — the argument, and you're aware, that usually we say good acts don't come in because this is just to prove good character. So what is the non-propensity line then? It's to show the possibility of mistake and to show the lack of intent. The government says we can introduce the other transactions because they tend to show lack of mistake and intent. These arguments would have been rebuttal of that. It wasn't — now, if the government hadn't opened on that, if the government had kept its case to just the transactions here involving ICOM tech, then I agree with you. He should not — he should not be able to introduce them. But the government didn't limit itself. And could you tell us exactly what evidence that you wanted to introduce? Well, he never got the opportunity to put that in, because the government — the government asked to have it precluded. And it was a categorical ruling by the court. Now, he did bring the evidence out in his motion for a new trial. And he did bring out the evidence, the statements of other investors who had worked with him over the years. And the judge said, well, that's newly discovered evidence. Of course, changing the topic slightly, that wasn't newly discovered evidence. That was to show that there was a denial of justice here and that he should have had a new trial under Rule 33A. Well, what specifically was the government's evidence that you wanted to introduce these things to rebut? The government presented several of the investors who testified that they had been involved in other transactions with him where they had lost money. And that — and the government argued that that went to show — they say it went to show background. It went to show this — that there was a series of transactions in which he was involved in. That's what went to the jury, that he had been involved in a series of transactions, of which this one was fortunate. Well, doesn't 404 contemplate that? Why does that contravene 404? Well, I'm saying it could come in under 404, but my argument is he should have been entitled — why wasn't he entitled to present contradictory evidence there? Why isn't he able to rebut that with his own evidence showing of other transactions that went — that were similar in nature that were not fraudulent? I mean, it's kind of — you know, we have this inclusionary rule in the Second Circuit, but it's an inclusionary rule if it shows guilt. If it rebuts the showing of guilt, then somehow the inclusionary rule doesn't work, and the judge can preclude him from bringing it in. No, I — your argument has some force, but, I mean — Thank you. It seems to me that's an argument for the Rules Committee. I mean, we — Well — That lack of symmetry in 404 has been around forever. But the inclusionary rule is a judge-created rule. It's not in the rules. The rules talk about that. And the judge never allowed — never got to the point — the trial judge here never got to the point of doing a 403 balancing to say — Correct me if I'm misremembering the record, but I thought that a good portion of the other act evidence proffered by the government — the string of companies, Instatradex, Skyblue90, Kuvera — that the allegation was that your client had — was telling people that they needed to invest to make up for the losses that they'd suffered from ICOM. So, I mean, that could be argued to be part of the direct evidence of the scheme, right? Yes, Your Honor, but he's not charged with fraud. He's charged with conspiracy. The conspiracy was ICOMITEK. Once the ICOMITEK conspiracy ended, that would not have been relevant as prior — this other act as part of the same conspiracy. That was over. You know, that's when he learned this was a conspiracy. Well, he, before that, was just engaged in a business similar to other businesses he had been in, and he was taking steps to avoid falling into that trap. But he was trapped anyway. I mean, he was — he's one of the victims. Interesting, there's no direct testimony of any conversations involving him and there's no documentation showing any direct conspiratorial action. What we have is basically a circumstantial case where he must have known this was a fraud. Well, then why wouldn't the evidence, precluded evidence, have been relevant to the jury in making that determination? I still have more than used up my time. I appreciate your patience. Good morning, Your Honors. May it please the Court, co-appellant counsel, my colleagues from the government. I'm representing Gustavo Rodriguez, whom I did not represent at trial, but I did represent him at sentencing. We have five arguments in our brief which we believe require reversal of this conviction and an order for a new trial. The first point is a manifest display of ineffective assistance of counsel. This wasn't in the realm of appropriate trial choices. In at least three distinct areas, trial counsel simply fell down on the job and failed to present exculpatory evidence, failed to challenge the entire thrust of the government's case, which did not state a crime, and failed from the outset of the government accusation to point out how that accusatory instrument was flawed in its reasoning. Now, I understand with regard to taking the last point first, the government's point is an indictment is not evidence, but when a jury has to examine a charge and there is a manifestly false statement or excerpt in that charge, to never mention it cannot be held to be more than the reasonable choices of counsel. Is there a reason why we wouldn't, why this isn't better suited for a collateral attack? Because the record is established at trial and it's established in a way that there weren't arguments about the ineffectiveness either at trial or at sentencing, but the complete absence of this. But don't we need to give your client the opportunity to waive counsel? Don't we need to have the trial counsel be able to explain himself or herself? I mean, there's a reason why we usually don't deal with it here, and so if you can explain to me, you just think the evidence is so overwhelming that it justifies a departure from our usual practice. And it's overwhelming in its absence of zealous advocacy. So in other words, I don't think there's a need for a procedural hurdle to be cleared for the defendant when on the record we can already see what wasn't done. And as regards to the waiver of attorney-client privilege, there was a fatical hearing at which Mr. Rodriguez testified extensively in what ostensibly would have been his trial testimony, both waiving his right to keep conversations with his trial counsel private on this issue. But I don't think the point could be more manifest and in lack of need of further fleshing out that when the entire theory of a defendant's guilt takes place over a year text chain, and there are maybe three or four individual exchanges within that text chain over a year which form the gravamen of the text chain, you can see how they're actually exculpatory, and trial counsel never says anything about that. I just don't see how that can be within the realm of acceptable or competent trial choices. And of course it's prejudicial, because it goes to the entire theory of the defendant's guilt. I think the most two or three examples which the government keeps hammering on, and I'm sure they'll do it here today, are the statements by Mr. Rodriguez that, or the statement by Mr. Carmona in a conversation with Rodriguez that he was only engaging a prestigious crypto mining company for show. But if you extend out, it's clear he's saying that in response to Rodriguez's insistence that he buy the mining equipment from him. It's not contextually that I'm confessing a fraud. It's I'm saying that I'm going to do the mining. It's not a fraud. I just don't want to buy it from you. I think that the ineffective assistance claim, and I thank Your Honor for the question, because I realize it is a little unusual, but I think on this record, and the lack of record is clear, I'll just briefly go over the other points as they're stated in the brief very briefly as well. With regard to conscious avoidance, there needs to be something to show that a defendant avoided as a substitute for a knowledge requirement. Otherwise, every case with a knowledge requirement would include a proper conscious avoidance charge. Here, there was absolutely nothing. Is there really nothing? I mean, didn't he set up the ticker to make sure that there was a fluctuating value and it was designed to show account balances unconnected to any actual account data? I'm glad Your Honor brought that up, because that's a key part of this whole case. There is, I submit there is nothing, because someone who builds a website for consumers related to, and is working for a client who's running a business, has no obligation to determine whether the business is actually functioning in an honest way. He's hired to build a website, and I don't think there is anything. But the question is, isn't that textbook conscious avoidance then? It's not, and I think some of the surrounding circumstances which are critical and don't often get mentioned. This was an MLM, a multilevel marketing company, which has in it a certain, that is kind of the business plan of a multilevel marketing. To create numbers that are completely unconnected to actual account balances, that's built into an MLM. I think Your Honor is conflating two issues. I'm asking the question so that I don't. Help me not conflate them. I think what Your Honor is asking about, and it is the key question to a lot of these issues, was, is it appropriate for a website designer, a website builder, to only focus on the functionality being requested of him by the person who commissioned the website? And I think the answer is yes. And I think it shows that there was no element, and it certainly wasn't argued at any point, or asserted that there was some effort to not know what Carmona was doing, and the text chain, and this goes back to the first point, was replete with discussions of functionality which belied that. Just very briefly, because I see I'm already over. It's a powerful piece of evidence that Carmona is telling Rodriguez that there are differences in the trading returns. But without anything to show that Rodriguez's charge was to evaluate Carmona's business, I think it's completely irrelevant to whether he was avoiding something. That was his job, to adjust functionality, not to judge. And one of the things that never gets said in this case, or I haven't seen it said enough, and I want to say it today, is in 2019, Bitcoin and all crypto, it's not, as Your Honor implies, some traditional asset. It was consistently going up. So the kind of things that seemed fanciful in the context of traditional investing were not fanciful here. And that was a necessary thing that wasn't addressed. The juror fear issue, there is no reasonable interpretation that a juror who's concerned that a defendant knows where they live is asking about anything other than fear of that juror. And to not address that was impermissible. The loss calculation, I defer to my co-counsel, is handled ably. But the one issue that Your Honor asked about that I think is the key offensive thing that the judge did with regard to the loss calculation is, almost all of that loss was fictional assets created within the system. It was basically no honor among thieves, where some of the salesmen who knew that this was a Ponzi scheme, they were adding their own points, and Judge Rashad counted that as loss. That was a huge part of the sentence. I thank you for permitting me to go over, and I will save the rest of my rebuttal. Good morning. May it please the Court. My name is Josiah Pertz. I represent the government. I represented the government at trial. I'd like to start and go in order. I'd like to start with David Carmona's argument today. And counsel has accused the government of conceding certain things. We do not. And in particular, we do not concede that the balance numbers in the spreadsheet, which the Court in part relied on, were entirely fictitious. In fact, there were several touch points that the Court used in order to substantiate the balances and to use them as a fact when considering this very wide range of the loss amount of $25 to $65 million. There is a question, I think, in the transcript and something worth clearing up about Juan Arellano's testimony and how he testified that this spreadsheet didn't include all of the accounts that he had created. And that involves comparing his testimony to the sheet itself. The spreadsheet shows three accounts under the name Juan Arellano, but in his testimony, he testified that there were, in fact, 15. And so when the district court ruled that this spreadsheet may, in fact, undercount or not include certain victims, that is what the district court was saying. So given the looseness with which the organization used numbers, what is your best evidence that the sum total of the spreadsheet does, in fact, reflect the amounts collected? And I accept and appreciate the wide range of the loss amount. The way the district court calculated and the way the government supports is looking at certain touch points, certain cells, to see how they compare to other evidence, looking at the corroboration. So we had testimony from Dr. Demetrio, transcript 497, that he lost about $30,000. On the spreadsheet, Government Exhibit 1303AT, there is a number of $35,000. I'll just give one more. Kimberly May has testified she lost about $43,000, and that's transcript 1153. And Government Exhibit 1303T shows $40,000. While it's certainly possible and, frankly, likely that not every cell is going to be accurate, it's enough that the court can say two things. First, there's enough accuracy here to try to make a reasonable estimate. And second, something that is equally true, strengthened in its conclusion by the testimony, and uncontested by the defendants and appellants, is the number of victims. When we have victims testifying that they lost money in certain amounts, their names are on the spreadsheet, and we see 12,000 independent names, that then provided a basis for the district court to make an estimate. Because the court could say, if people lost, on average, $1,000, maybe a little more, and there are 24,000 unique names, we're starting to get awfully close to that range. I'd like to also... What does it mean when you say awfully close to the range? That sounds like it's still outside the range. Well, if you're using a round number of $1,000 and multiplying that by 24,000 users, if, in fact, the number is higher, if it's $2,000 in loss per user, then 24,000 users times 2,000 becomes 48 million. And so I used that loosely when I said close to it. Are we dealing with guesswork here? No. We're dealing with a reasonable estimate. And it's not only the spreadsheet and not offering the court a chance to guess, but it's offering a touchpoint. And that's a touchpoint... The one touchpoint, if I'm understanding correctly, is the spreadsheet had lots of names in it. Some of them were corroborated by evidence in the record. There was a victim who says, I lost amount similar, very close to the amount on the spreadsheet. There were many names on the spreadsheet. And if you multiply some approximate number of names by $1,000, you get close to 25 million. What other evidence was there? There was the screenshot of the calculation that Gustavo Rodriguez had performed, and that showed a $21 million balance early in the scheme. That was March of 2019, and the scheme continued for months after that. So what did that do? That showed a balance of over $21 million. And because of the way Ponzi schemes... So we assume that it was all stolen money? ICOM Tech had absolutely no legitimate purpose. Pardon me? ICOM Tech, this fraud, had no legitimate purpose. Any money that was coming into the scheme, coming into David Carmona, being registered on the website, is a fraud. Proceeds of fraud. Correct. The website itself is promising something. It promises that there's cryptocurrency trading and mining. Are you talking about the screenshot? No, I'm giving some background as to why every dollar coming into this scheme is a fraud dollar, because there's no legitimate business activity. And there's testimony that the founders, David Carmona being one, contacted a cryptocurrency mining machine company, but then ultimately didn't receive any machines. And throughout the case, it was clear, and in fact conceded at trial, that this was a scam. So when we see $21 million in that screenshot, when the defendant, Gustavo Rodriguez, is talking to David Carmona and saying, here are the total earnings, these are not earnings of a legitimate business. This is stolen money. So we have both, and I should add, both the screenshot and the spreadsheet come from co-conspirators. The spreadsheet, as can be seen in Government Exhibit 1303, not 1303A, which is the attachment, is something that Aileen Hernandez sends herself. She e-mails from her iCloud account to her Gmail account this spreadsheet. And is this important to show that these are not the fictitious numbers with which they're luring in new investors? This is information shared among co-conspirators. That's a fair inference, that they have less reason to lie to each other. David Carmona's counsel mentioned a loss number calculated before trial in connection with the sentencing and the plea of co-conspirator Ochoa. And this was before the government fully had a handle on the loss amount. It was before we had marshaled evidence. Even if we had it somewhere in the file, there's nothing like a trial to sharpen understanding. It was also before Juan Ariano was signed up as a cooperator, and we could debrief him and find out what these numbers meant, get a little more insight. So any discrepancy doesn't go to the substance, it goes to the government's process. And by the time it was time for sentencing, David Carmona and the two trial defendants, the government had that number backed up in more than one way. So it's principally the cooperator that is the new light that was shed on the information in the government's possession? That's part of it. It's the cooperator, and it's reviewing the evidence, frankly. Reviewing the documentary evidence. That's right. The government needed to look at a very voluminous file, figure out what documents were. It's one thing to collect them or mark them as responsive. It's another to do the work required to interpret the documents in light of each other. And that's why we end up with a guidelines range significantly more severe for Carmona than for Ochoa. That's correct. When Judge Rochon made a comment about David Carmona not fully accepting responsibility at sentencing, she did so because David Carmona said that he was principally doing this fraud scheme to help people. And that comment alone was worth the court noting this did not seem like a fulsome acceptance of responsibility. The court still gave David Carmona the benefit of the guidelines calculation for acceptance of responsibility points, but in determining his sentence under the 3553A factors, she determined that because he was not fully accepting responsibility, this in part substantiated the significant sentence he received. I'd like to move on to David Brand. There's a 404B issue, and there was some discussion earlier about supposedly legitimate MLMs that David Brand participated in. The record is devoid of any factual substance here. Even now, counsel for David Brand cannot point to a single MLM that was supposedly legitimate, about which there was no evidence introduced. There was only one MLM mentioned by David Brand in his motion for new trial, and that was life vantage. And that, in fact, did come up at trial. So David Brand had the opportunity to make the point he now seeks to make. And we agree with Your Honor, there is an issue about good acts, about propensity, and when the court forbid David Brand from introducing these supposed legitimate MLMs, which he can't cite to. I'm sorry. I'm not sure that I can. Can you just be clear? Your argument is that he was allowed to introduce it, or your argument is that it was reasonable for him not to be allowed? Or are you making an alternate argument? Those seem the statements don't seem to work very well, because it seems to me that if you are allowed to present evidence of his other bad acts, we have to ask why his good acts don't come in. Where's the difference between the two? There are a few strands. I think I'm the one who's conflated at this time. There was a ruling by the court keeping out legitimate MLMs. David Brand nonetheless got to discuss life vantage, because there was evidence introduced by a government witness that David Brand participated in this legitimate MLM. He now seeks to introduce evidence of legitimate MLMs, but it turned out he introduced one already. So the issue is moot in several ways, but I'd like to mention part of the reason he doesn't get some new opportunity to introduce more evidence or that the court's ruling was correct at the time is not only the 404B, it's that these other fraudulent MLMs about which the government introduced evidence and, as Judge Livingston pointed out, are direct evidence of his men's rape. When he is asking a victim to put money into InstaTradex as the only way, in his words, to get money back from ICOM Tech, and then that turns out to be a fraud, and then he does it again, there's an unbroken string of these fraud schemes that go under different names but are directly tied in to ICOM Tech. And so it's not just a 404B basis for admission, it's direct evidence. And David Brand also doesn't get to rely on supposed past good experience to undo his knowledge of fraud. Once he hears that this is a fraud scheme, he learns these red flags, he can't ratchet it back and say, well, I was involved in a legitimate business years ago, so that makes this legitimate all of a sudden. He knew that it was a fraud for the reasons we've pointed out, and he had to make his decisions based on that knowledge. And you're brief, I think, and correct me if I'm misremembering, but I think you make the argument that the evidence of bad acts comes in partly on the sort of doctrine of chances. So you can't, you know, he's participating in one company after another and they're all frauds. It can't be a mistake. If that's your theory, doesn't the defense have, the appellant have a point, that if there are a lot of other companies that were perfectly legitimate, it changes your odds? If there were only a 404B absence of mistake basis for admission, then maybe we could look at if maybe there were a factual basis where he said, look, here are the 10 MLMs that I'm trying to introduce, here's why. They're the same as ICOM Tech, not just their businesses, or they involve a pyramid structure, but their cryptocurrency, their promising outrageous rates of return, and those all turned out to be legitimate. But it's not just a 404B. We have this direct evidence of mens rea as well, and that independent basis also defeats the argument. On Rodriguez, I would only say this. I think we agree with defense counsel that the court may resolve the ineffective assistance claims now, if it wishes. The government argues that they are meritless. And I'll end with this comment. No, no, no, no. I want you to talk about how the victim impact statements are provative of fraudulent intent. As to how where, for instance, Diana Martinez testified that she told David Carmona she needed the money back because she needed it to pay for her cancer treatment, for health treatment for her father. Something to clarify, this is not simply testimony. This is hard-coded in the documents. In the 1600 series, we have exhibits that are Diana Martinez's chats with David Carmona. And in these chats, she introduces herself. She describes why she's writing him, what money she wants back, and explains that it's urgent because she has health problems she needs to deal with. But doesn't that put us in a position where you're asking us to suggest that a legitimate investor has to give their client money back if they have a really good reason? No. It's one fact among many that establishes David Carmona's intent. It says, because this person has no interest, it's proof of his mens rea. And courts are clear that somebody's total callousness when dealing with a victim request is a factor that may be considered. It's an inference the jury may draw. The court doesn't have to say this is one that must be drawn. But why wouldn't you have accomplished that by just saying the witnesses testified that they intentionally invested with their money and they never got it back? Why do we need to hear the story about cancer? I think it would have to leave out the chat or make the chat redacted in ways that makes it less comprehensible. And in order to allow the chat to come in in full, allow the testimony to come in full, and allow the evidence of intent, the court was careful in having limiting instruction. The court was pointed out below that we, as the government, made efforts to show that the cancer was not terminal, that everything turned out okay in order to lessen the prejudice. So there was some caution to deal with the potential risks of this. And when the court has a ruling, then that ruling has to be arbitrary and irrational on this court's review, and it was not. The judge had a fine basis for allowing it in and putting on the guardrails that were put on. Gustavo Rodriguez mentioned in his final comment that this was a cryptocurrency scheme and there was so much new about this, but a Ponzi scheme is pretty much timeless. That's what the court has here. And unless the court has further questions, the government respectfully requests that it affirm the decisions below. Thank you. Your Honors, I have three points to make. First, with respect to the text message about the $21 million total earning, I set it out on page 37 of my brief to make it easy for the court to see. But the context here is that David Carmona is saying in these text messages, I don't want people to be using their, you know, supposed earnings to buy more crypto. So the total earning figure was fictitious because there were no earnings. This is what they were representing to the investors that their money was worth. This isn't how much they took in. And the government's argument here is absolutely wrong. I won't characterize it in any other way. Now, it's very important to look at the context which I've set out on my brief. The government has its conclusion, well, this is the earnings. This is how much they made. No, this is how much they told people their money was worth. So that is completely baseless. Now, secondly, the government said at the sentencing that Mr. Ochoa left the conspiracy early. And they repeated it several times. But when Ochoa was sentenced, they said, and this is, I think, the document 119, that he was in for the whole ride, that he was a central figure, central promoter, if not the promoter. And they said he was in through at least the end of 2019. So when Ochoa gets sentenced and they want the high end of the 57 to 71-month guideline, they're telling the court he's in for the whole thing. When my client gets sentenced and my client says, wait a minute, that guy got, his lawyer said, that guy got 60 months, and now you want a 188-month guideline range? That's wrong. Well, the government then said, oh, well, he left early. They tried to minimize him. They can't have it both ways. And the third point I want to make to you very briefly is that the notion that Juan Arellano could add anything to this case is absolutely ridiculous. Juan Arellano's testimony made no sense whatsoever, did not cast no light on the reliability of the spreadsheet that he didn't create, couldn't explain, and didn't explain. So the government saying that, oh, this proves there was $58 million based on what Arellano said is absolutely baseless. Thank you. Thank you. I want to pick up where counsel left off, which is on Arellano. Judge, you have to understand, this spreadsheet, nobody knew what this spreadsheet meant. The government today doesn't know what it means. Arlene Hernandez never testified. She never explained where this came from. They did ask Arellano about it. They introduced it. But then Arellano, in his testimony, I discussed this at page 68 of my brief and cite transcript page 1029, he admitted he did not create it, he did not know who did, and he could not vouch for its accuracy. So when the government stands up here and they say, well, he had more information and now we understood it, they asked him about a couple of terms. He said he gave what he thought was his understanding of those terms, but they never produced anybody who explained it. I mean, this is a fraud case in which the government doesn't present a witness, a summary witness, to analyze this document and explain what this document means. I mean, it's clear why they didn't. Nobody had a clue what it meant. And that goes, and that drove everything. That drove the sentence. Now, I agree that Mr. Bren got a below-guideline sentence because the guidelines were so crazily inflated. Why, if the government knew what the losses was, why is the restitution order for this case so difficult? Why is it so difficult? And the reason is clear. They couldn't support this. The judge himself said, this is a — nobody really understands this spreadsheet. Plus, when Arellano testified, he talked about these two lines of records they kept, which is totally incomprehensible. Your Honors, I'll rely on my arguments in the briefs, and thank you very much. Just to pick up on a few points that my colleagues pointed out in a more concrete way, both with regard to all the appellants and I think most particularly to my client. First of all, my client did not earn one penny from this fraud, which I think colors the arguments I made on my initial presentation in a very positive light. Number two, I think there were three or four victims who testified at this trial. I don't think any of them lost more than a five-figure amount. And as my colleagues pointed out, the best that we can get on the loss amount, the actual loss amount, is about $700,000. The rest is a morass of fictitious numbers put into the system by bad actors looking to get points from and money from Carmona himself, not victims in the field. That is the best evidence we have about what the spreadsheet represents. Nothing to do with actual loss. With regard to the victim impact statements, which I did not get a chance to address much on my initial presentation, none of these victims knew Gustavo Rodriguez. I think Your Honor's question to the government counsel is the sine qua non of why this needs to be reversed because we didn't need any of the testimony of the hardship to get to the fraud. It wasn't background. And the government's statement here in their argument that it had to be included in some way because if not, we would have had to redact the text. Well, we redact evidence all the time. As it stood, Mr. Rodriguez, a man who knew none of the victims, who never was front-facing, who in his year-long text chain with Carmona over and over again discussed merely the requirement of him building a website and the functionality of it and the fact that almost none of the loss took place while Mr. Rodriguez was running the website. Almost all of it happened after Rodriguez was fired. Carmona blamed him for stealing money as a way of covering up his own fraud. I think it's clear that this case needs to be reversed and remanded for a new trial. Thank you, Your Honor. Thank you all. Thank you all, and we will take it under advisement.